[Cite as *Carpenter v. Long*, 196 Ohio App.3d 376, 2011-Ohio-5414.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

| | | |
|---|---|---|
| CARPENTER, | : | |
| Appellant, | : | C.A. CASE NO.   2011 CA 3 |
| v. | : | T.C. NOS.   08CV1173/08CV317 |
| LONG et al., | : | (Civil appeal from Common Pleas Court) |
| Appellees. | : | |

. . . . . . . . .

| | | |
|---|---|---|
| ARTHUR et al., | : | C.A. CASE NO. 2011 CA 4 |
| Appellants, | : | T.C. NO. 08CV1173/08CV317 |
| v. | : | (Civil appeal from Common Pleas Court) |
| LONG et al., | : | |
| Appellees. | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the 21st day of October, 2011.

. . . . . . . . . .

Joseph P. Moore, for appellant Anna M. Carpenter.

Ray C. Freudiger and Mark C. Engling, for appellees George Long and Big Hill Realty Corp., d.b.a. Big Hill GMAC Real Estate.

Paul M. Courtney and John B. Huber, for appellants Richard D. Arthur and Chanin Clymer.

Thomas L. Czechowski and Joseph C. Krella, for appellee Stoneridge Development, Ltd.

. . . . . . . . . .

DONOVAN, Judge.

{¶ 1} This matter is before the court on the notices of appeal of Anna M. Carpenter, filed January 13, 2011, and Richard D. Arthur and Chanin L. Clymer, filed January 14, 2011.

{¶ 2} The appellants appeal from the December 20, 2010 "Judgment Entry Adopting Magistrate's Decision (Revised) on Motion of Defendants George Long and Big Hill Realty Corp., dba Big Hill GMAC Real Estate for Summary Judgment on all Claims (in both Cases) [and the] Judgment Entry Adopting Magistrate's Decision (Revised) on Motion of Defendant Stoneridge Development, LTD for Summary Judgment on Plaintiffs' Arthur's and Clymer's First Claim for Relief Against Stoneridge."

{¶ 3} On March 12, 2008, Carpenter filed a complaint in the common pleas court against Long, a real estate agent, and Big Hill Realty Corporation ("Big Hill"), in case No. 2008 CV 0317, asserting claims of negligent misrepresentation, professional negligence, negligence, and respondeat superior liability. Carpenter asserts that she owned real property at 1955 N. Old Fairfield Road in Beavercreek and that in September 1998, she entered into an "Option and Lease Agreement" with AT&T Wireless, pursuant to which AT&T Wireless installed and operated an antenna on her property in exchange for monthly rent. In December 1998, AT&T Wireless assigned its rights and obligations to Cincinnati Bell Wireless, and in July 1999, Carpenter and Cincinnati Bell Wireless entered into an amended lease agreement that allowed for the antenna to be relocated on the property. In 2005, Carpenter entered into an agreement with Long to sell the Old Fairfield Road property. After March 2006, Long became a dual agent, representing both Carpenter and Stoneridge Development Ltd. ("Stoneridge"), which purchased the property.

{¶ 4} In June 2006, as part of the sale of the property, Carpenter and Stoneridge executed an

"Assumption Agreement," which provided that Cincinnati Bell Wireless would continue to make rental payments to Carpenter. Carpenter also executed an "Assignment of Lease," in which she assigned her lease rights to Stoneridge, and Stoneridge executed an "Assignment of Rent Payments," granting Carpenter the rights to the rental payments. These documents were not recorded with the county recorder's office. According to Carpenter, Long assured her that her interest in the rental income was protected.

{¶ 5} In July 2006, Long acted as agent in the sale of the Old Fairfield Road property to Arthur and Clymer. In October 2006, Cincinnati Bell Wireless stopped making rental payments to Carpenter and filed an interpleader action in the Greene County Court of Common Pleas in case No. 2006-CV-0885. The basis of the interpleader action was that Arthur and Clymer had asserted a claim to the rental payments, and Cincinnati Bell Wireless asked the court to determine the proper recipient(s) of the rental income. Carpenter filed a cross-claim against Arthur and Clymer, asserting that she had "suffered damages as a result of Arthur and Clymer's tortious interference because she is now prohibited from receiving rent payments." Arthur and Clymer filed a third-party claim against Stoneridge, which they later dismissed. After mediation, the matter was settled, and the trial court issued a dismissal entry with prejudice, as well as an agreed entry.

{¶ 6} In her complaint herein, Carpenter argues that she "suffered damages * * * because in October of 2006, Cincinnati Bell Wireless stopped making rental payments to Plaintiff Carpenter and filed an interpleaded [sic] action." According to Carpenter, Long failed to ensure that the documents pertaining to her rights to receive the rental income were recorded and failed to include her right to receive the rental income in the purchase contract between Stoneridge and Arthur and Clymer so as to provide Arthur and Clymer with notice of Carpenter's interest.

3

**{¶ 7}** On April 11, 2008, Arthur and Clymer filed a complaint in the Montgomery County Court of Common Pleas against Long, Big Hill, and Stoneridge, which was later transferred to Greene County as case No. 2008 CV 1173. In their first claim for relief, Arthur and Clymer asserted breach of contract and warranty against Stoneridge. Arthur and Clymer claim that they were damaged "to the extent of the portion of the cell tower rentals assigned to Anna Carpenter through 9/1/2015, and the attorney fees incurred by the Plaintiffs in defending the Interpleader action." In their second claim for relief, Arthur and Clymer assert that Long and Big Hill breached their agency duties by "failing to except the cell tower rentals from the written purchase agreement and failing to except the cell tower rentals from the warranty deed delivered by said defendants to the closing agent on or about July 14, 2006." In their third claim for relief, Arthur and Clymer assert that Long and Big Hill "breached their duties to exercise ordinary care to protect the interests of their principals," causing them "to incur money damages as described above." In their fourth claim for relief, Arthur and Clymer assert that "Defendant Long was working and acting within the scope of his employment as an employee, agent, and officer of the Defendant Big Hill Realty Corp." and that "said Defendants acquiesced in, ratified, and benefitted from the actions of Defendant Long." On March 5, 2009, the magistrate consolidated Carpenter's case with that of Arthur and Clymer.

**{¶ 8}** Stoneridge filed a cross-claim in the Montgomery County Court of Common Pleas that was transferred to Greene County, asserting that Stoneridge is entitled to indemnity from Long and Big Hill.

**{¶ 9}** On September 18, 2009, Long and Big Hill filed a motion for summary judgment "on all claims." On November 2, 2009, Stoneridge filed a motion for summary judgment against Arthur and Clymer. The matter was referred to a magistrate, and on May 11, 2010, after a hearing, the magistrate

4

granted summary judgment in favor of Long, Big Hill, and Stoneridge, denied all claims of Carpenter against Long and Big Hill, and denied all claims of Arthur and Clymer against Long, Big Hill, and Stoneridge.

{¶ 10} On May 18, 2010, Carpenter, Arthur, and Clymer jointly filed a request captioned "Joint Findings of Fact and Conclusions of Law," asking that the magistrate provide specific findings of fact and conclusions of law.

{¶ 11} On June 1, 2010, the magistrate issued a revised decision. The revised decision incorporated, "as if fully set forth herein, and as Findings of Fact in this Decision, the undisputed and unrebutted Statement of Fact at Section II of the Long/Big Hill Motion for Summary Judgment." The magistrate relied heavily upon *Hoover v. Transcontinental Ins. Co.,* Greene App. No. 2003-CA-46, 2004-Ohio-72, which addresses the use of nonmutual defensive collateral estoppel to prohibit a party or another person from relitigating an issue.

{¶ 12} According to the magistrate's revised decision, the undisputed facts upon which the granting of summary judgment rests were set forth in the agreed entry filed by the court on November 16, 2007, in the interpleader case, a certified copy of which is attached to Long and Big Hill's motion for summary judgment. The decision further notes, "Both sets of defendants in the Interpleader case brought by Cincinnati Bell Wireless, Richard D. Arthur and Chanin L. Clymer, and Anna S. Carpenter, maintained in their Answers that they were entitled to the entire lease payment from Cincinnati Bell Wireless for the communications/antennae facility on the property at 1955 Old N. Fairfield Road, Beavercreek, Ohio. But, in their Agreed Entry ordered by the Court, the Parties, by mutual agreement, litigated away that issue with prejudice.

{¶ 13} "Both sets of Defendants in the Interpleader action agreed that Carpenter would receive

5

$750.00 per month rental income for Cincinnati Bell Wireless' use of the property, commencing December 1, 2007 and continuing each month with the final payment ending September 1, 2015. In the same Agreed Entry, Defendants Arthur/Clymer were ordered to receive the balance of all rental income paid pursuant to the Lease, including any and all increases and/or reimbursements, and [any] other obligations owed by Lessor to the Lessee thereunder. In the Agreed Entry, the Parties also agreed that 'All rental payments deposited by Plaintiff, Cincinnati Bell Wireless, to the Clerk of Courts from November 1, 2006 and thereafter shall be divided as follows:

"1) 50% to Defendants Arthur/Clymer

"2) 50% to Defendant Carpenter.' " (Emphasis sic.)

{¶ 14} The magistrate noted that the agreed entry provides, " 'All claims in this Case shall be dismissed with prejudice within 30 days from the date of this Agreement.' On November 16, 2007 the Court filed a Dismissal Entry ordering that the Interpleader Case was dismissed with prejudice." The decision notes that Carpenter and Arthur and Clymer "both ask the Court, implicitly, as a preliminary matter, to determine that each set of Plaintiffs was entitled to receipt of the entire lease payment from Cincinnati Bell Wireless * * *. The adjudication of that preliminary issue is a predicate to the Court's next determining that the Defendants in the two cases, Long and Big Hill in 2008 CV 0317 and 2008 CV 1173, and also Stoneridge in 2008 CV 1173, are liable to Plaintiffs for the portion of the cell tower lease payment from Cincinnati Bell Wireless that Plaintiffs voluntarily relinquished by the Agreed Entry filed on November 16, 2007 in Interpleader Case No. 2006 CV 0885. Both sets of Plaintiffs are asking this Court to adjudicate which Plaintiff was the proper recipient of the entire monthly rental payments from Cincinnati Bell Wireless, and to assign liability for the Plaintiff's not receiving the full rental payment, to George Long and Big Hill Realty in the Case of Anna Carpenter

6

and to George Long, Big Hill Realty, and Stoneridge in the Case of Arthur & Clymer.

{¶ 15} "But that question of whether Anna Carpenter or Arthur & Clymer should have been entitled to receive the entire cell tower rental payment was fully adjudicated in Interpleader Case No. 2006 CV 0885.

{¶ 16} "The Defendants in that Case, who are the two sets of Plaintiffs in the two cases currently pending before the Court, had the opportunity to litigate the issue in the Interpleader action brought by Cincinnati Bell Wireless.

{¶ 17} "Although the two sets of Plaintiffs in the two cases pending before the Court recited in their Agreed Entry that they did not intend for the Agreement to release any claims or causes of action they may have against third persons or entities not a party to this [A]greement, the Magistrate concludes as a matter of law, that Plaintiffs are subject to the doctrine of non-mutual defensive collateral estoppel. That doctrine is applicable when a party against whom the doctrine is asserted previously had his day in court and had the opportunity to fully litigate the specific issue sought to be raised in a later action. Plaintiffs herein, the Defendants in the Interpleader Case, may not escape the applicability of the law by expressing their intention to avoid the law."

{¶ 18} The magistrate noted that Long, Big Hill, and Stoneridge all pleaded the affirmative defense of estoppel in their answers to the plaintiffs' complaints. Relying upon *Hoover*, 2004-Ohio-72, the magistrate concluded that the plaintiffs in the two pending cases "had their day in court on the specific issue brought into litigation * * *. That issue was: What party was entitled to receive the cell tower rental payments from Cincinnati Bell Wireless * * *."

{¶ 19} The magistrate continued, "Although Long, Big Hill and Stoneridge were not parties to 2006 CV 0885, collateral estoppel applies in this case in the absence of mutuality of parties. This

7

issue of the proper recipients of the cell tower rental payments is *res judicata* and Plaintiffs are collaterally estopped to raise it again in the two pending cases. And Plaintiffs have raised the issue for adjudication by the Court. The alleged liability of the named Defendants for the sets of Plaintiffs' receiving less than the entire rental payment, necessarily requires an adjudication by the Court that one or the other of the Plaintiffs was entitled to the entire rental payment before liability may be attributed to any Defendant for the respective Plaintiff's receiving less than the entire cell tower rental payment.

{¶ 20} "The Magistrate concludes that the intent of the two sets of Plaintiffs in the two Cases now, expressed in the Agreed Entry, when they were Defendants in the Interpleader case, not to release claims or causes of action that they might have against third persons, does not displace the applicable law as enunciated in *Hoover*[, 2004-Ohio-72], and the cases relied on in that opinion."

{¶ 21} Regarding Stoneridge's motion for summary judgment, the magistrate found "liability under the Complaint in 2008 CV 1173 is only with respect to breach of contract and breach of warranty to the extent of the portion of the cell tower rentals assigned to Anna Carpenter thru September 1, 2015. Hence, Arthur & Clymer are trying to recoup the cell rentals from Stoneridge that were paid to Anna Carpenter by virtue of the Agreed Judgment Entry in 2006 CV 0885. Arthur and Clymer relinquished their right to pursue those very damages when they agreed to the precise allocation and adjudication of cell tower rental income between themselves and Anna Carpenter in the Agreed Judgment Entry. Hence, Arthur & Clymer are also precluded by estoppel from pursuing against Stoneridge in this Case, the same claim that was fully adjudicated in 2006 CV 0885. As far as the Cross-Claim of Stoneridge against Long and Big Hill Realty, a claim for indemnity; there being no liability on the part of Long and Big Hill Realty Corp., there is no liability for indemnity on the part of

Stoneridge."

{¶ 22} Carpenter and Arthur and Clymer filed objections, and on December 20, 2010, the trial court issued a decision adopting the magistrate's revised decision. After setting forth the appropriate standard of review (de novo) and quoting from *Hoover*, 2004-Ohio-72, the trial court overruled all objections to the magistrate's decision, finding that "[a]ll the requirements of *Hoover* * * * for application to these two Cases have been met, and the doctrine of non-mutual defensive collateral estoppel entitles Defendants to summary judgment in their favor against Plaintiffs."

I.  Carpenter's appeal

A.  Res Judicata

{¶ 23} Carpenter asserts four assignments of error. Her first assignment of error is as follows:

{¶ 24} "The trial court erred as a matter of law by granting summary judgment and misapplying the doctrines of res judicata and collateral estoppel and thereby preventing this action from proceeding forward."

{¶ 25} "Civ. R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Cohen v. G/C Contracting Corp.,* Greene App. No. 2006 CA 102, 2007-Ohio-4888, ¶ 20.

{¶ 26} "When reviewing a trial court's grant of summary judgment, an appellate court conducts a de novo review. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105. 'De Novo

9

review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial.' *Brewer v. Cleveland City Schools Bd. of Edn.* (1997), 122 Ohio App.3d 378, 383, citing *Dupler v. Mansfield Journal Co.* (1980), 64 Ohio St.2d 116, 119-120.

{¶ 27} "Therefore, the trial court's decision is not granted any deference by the reviewing appellate court." *Selective Ins. Co. of Am. v. Arrowood Indemn. Co.*, Montgomery App. No. 23400, 2010-Ohio-557, ¶ 9.

{¶ 28} Carpenter asserts that the trial court failed to apply "the appropriate standard" herein and that *State ex rel. Davis v. Public Emps. Retirement Bd.*, 120 Ohio St.3d 386, 2008-Ohio-6254, and not *Hoover*, 2004-Ohio-72, applies. We first examine *Hoover*, upon which the trial court relied. Hoover was injured while riding in a vehicle driven by his son. He sought underinsured-motorist benefits under commercial automobile and general-liability policies issued to his closely held corporation, as compensation for cognitive amnestic disorder allegedly caused by the accident. We affirmed the trial court's grant of summary judgment against Hoover. It had been determined, in a workers' compensation proceeding, that Hoover did not suffer from cognitive amnestic disorder as a proximate result of the injuries he sustained in the accident, and we concluded that Hoover was collaterally estopped from seeking insurance benefits based on the same disorder.

{¶ 29} Hoover argued on appeal that the trial court erred in applying collateral estoppel to him because his son, who drove the vehicle in the accident, and the insurance companies, from whom he sought benefits, were not parties in the prior workers' compensation action. We reasoned, "This argument implicates the concept of mutuality. As Mr. Hoover properly notes, '[i]n Ohio, the general rule is that mutuality of parties is a requisite to collateral estoppel, or issue preclusion. As a general

principle, collateral estoppel operates only where all of the parties to the present proceedings were bound by the prior judgment. A judgment, in order to preclude either party from relitigating an issue, must be preclusive on both.' *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, * * * at paragraph one of the syllabus." *Hoover*, 2004-Ohio-72, ¶ 7.

{¶ 30} We agreed that under the "foregoing general rule, Mr. Hoover's workers' compensation action undoubtedly would have no collateral estoppel effect on the present litigation because the defendants in this case were not parties to the workers' compensation action and were not bound by the judgment in that case. The crucial issue is whether an exception to the general rule allowed the trial court to apply collateral estoppel absent mutuality of parties. In *Goodson*[, 2 Ohio St.3d 193], the Ohio Supreme Court acknowledged that there may be exceptions to the general requirement of mutuality. In particular, the *Goodson* court cited *Hicks v. De La Cruz* (1977), 52 Ohio St.2d 71, * * * as an example of its willingness to 'relax' the mutuality requirement 'where justice would reasonably require it.' *Goodson*, supra, at 199, * * *." *Hoover*, 2004-Ohio-72, ¶ 8.

{¶ 31} "In *Hicks*, a negligence action, the city of Cincinnati sought to argue that it had immunity from liability because the Cincinnati General Hospital was a state-owned facility. On review, the Ohio Supreme Court noted that the city had taken the opposition position in an earlier case * * *, wherein the city had argued, and a court had found, that it owned, operated, and controlled the hospital. In light of [the earlier case], the *Hicks* court concluded that collateral estoppel precluded the city from re-litigating its ownership of the hospital even without mutuality of parties. In support of its decision, the *Hicks* court reasoned, in part:

{¶ 32} " 'The modern view of res judicata embraces the doctrine of collateral estoppel, which basically states that if an issue of fact or law actually is litigated and determined by a valid and final

11

judgment, such determination being essential to that judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim. *A party precluded under this principle from relitigating an issue with an opposing party likewise is precluded from doing so with another person unless he lacked a full and fair opportunity to litigate that issue in the first action, or unless other circumstances justify according him an opportunity to relitigate that issue.' Hicks*, supra, at 74 * * * (emphasis added).

{¶ 33} "In *Goodson*, the Ohio Supreme Court rejected an argument that *Hicks* constituted an abandonment of the requirement of mutuality. Rather, the *Goodson* court read *Hicks* as creating a narrow exception to the mutuality rule, explaining:

{¶ 34} " 'This court in effect was stating in *Hicks* that under those facts where it was shown that the party defendant clearly had his day in court on the specific issue brought into litigation within the later proceeding, the non-party plaintiff could rely upon the doctrine of collateral estoppel to preclude the re-litigation of that specific issue. We believe this exception to the principle of mutuality to be a proper one.

{¶ 35} " '* * *

{¶ 36} " 'The main legal thread which runs throughout the determination of the applicability of res judicata, inclusive of the adjunct principle of collateral estoppel, is the necessity of a fair opportunity to fully litigate and to be "heard" in the due process sense. Accordingly, an absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action. * * *.' *Goodson*, supra, at 200-201, * * *. " *Hoover,* 2004-Ohio-72, ¶ 9-14.

**{¶ 37}** In *Hoover* we noted that after *Goodson*, courts have "expressed some uncertainty and disagreement regarding the scope of the mutuality exception discussed above," and we noted cases in which the mutuality exception was narrowly interpreted. *Hoover* at ¶ 15. We further noted that a "review of Ohio case law indicates, however, that no other appellate district has interpreted the exception so narrowly. Among the other appellate districts to have addressed the issue, the apparent consensus is that *Hicks* and *Goodson* in essence eliminate the mutuality requirement if the party against whom collateral estoppel is asserted has had his day in court in a prior action and, in that forum, was permitted to fully and fairly litigate the specific issue raised in a later proceeding. In *McCrory v. Children's Hospital* (1986), 28 Ohio App.3d 49, 53, * * * a Tenth District case, then-judge Thomas Moyer reached precisely this conclusion, relying on the language from *Goodson* quoted above." Id.[1]

**{¶ 38}** We also noted that "in more recent cases the Ohio Supreme Court has indicated that collateral estoppel applies " 'when the fact or issue (1) was actually and directly litigated in the prior action, (2) was passed upon and determined by a court of competent jurisdiction, and (3) *when the party against whom collateral estoppel is asserted was a party [or] in privity with a party to the prior action.*' " *New Winchester Gardens, Ltd. v. Franklin Cty. Bd. of Revision*, 80 Ohio St.3d 36, 41 * * * (emphasis added), quoting *Thompson v. Wing*, 70 Ohio St.3d 176, 183.. * * * This court recently set forth a similar test for the application of collateral estoppel in *Brady v. Brady*, Montgomery App. No. 19006, [2002 WL 626963].. Insofar as mutuality is concerned, we stated only that the party against

---

[1] *McCrory* involved a tort claim for medical malpractice filed initially in the Ohio Court of Claims against the state, the Ohio Youth Commission, and a doctor who was later voluntarily dismissed. The McCrorys prevailed against the state and the youth commission, and the case was refiled against the doctor in a common pleas court, which partially granted the doctor's summary judgment motion on the basis of collateral estoppel, to preclude relitigation of two issues relating to proximate cause, although the malpractice claim itself was not barred. The Tenth District Court of Appeals found *McCrory* to be "an exception to a general rule requiring identity of parties and issues prior to the application of the defense of collateral estoppel."

13

whom collateral estoppel is sought must have been a party, or in privity with a party, to the prior action. Id. at *3." We determined, consistent with *McCrory* and other cases cited in our decision, that those authorities suggest that "mutuality is not required if the party against whom collateral estoppel is asserted fully litigated an issue in an earlier action." *Hoover*, 2004-Ohio-72, ¶ 16.

**{¶ 39}** We concluded, "albeit with some reluctance, that Ohio law allows the use of non-mutual defensive collateral estoppel when a party against whom the doctrine is asserted previously had his day in court and was permitted to fully litigate the specific issue sought to be raised in a later action." Id. at ¶ 17.

**{¶ 40}** Regarding *Davis,* Carpenter's recitation of the collateral-estoppel rule, as set forth therein, is identical to the three-part rule set forth in *Hoover. Davis,* 120 Ohio St.3d 386, 2008-Ohio-6254, ¶ 28, citing *Goodson,* Ohio St.3d at 210, 443 N.E.2d 978 ('an absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action"). *McCrory*, 28 Ohio App.3d at 54.

**{¶ 41}** *Davis* noted, "When an issue is not actually litigated and decided in the previous proceeding, collateral estoppel does not preclude the issue from being litigated in the subsequent proceeding. [Citation omitted.] This actual-litigation requirement for the application of collateral estoppel is explained in 1 Restatement of the Law 2d, Judgments (1982) 256-257, Section 27, Comment e:

**{¶ 42}** " 'A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action. There are many reasons why a party may choose not to raise an issue, or to contest an assertion, in a particular action. * * * The interests

14

of conserving judicial resources, of maintaining consistency, and of avoiding oppression or harassment of the adverse party are less compelling when the issue on which preclusion is sought has not actually been litigated before. * * *

{¶ 43} " 'It is true that it is sometimes difficult to determine whether an issue was actually litigated; even if it was not litigated, the party's reasons for not litigating it in the prior action may be such that preclusion would be appropriate. But the policy considerations outlined above weigh strongly in favor of nonpreclusion, and it is in the interest of predictability and simplicity for such a result to obtain uniformly.' " *Davis,* 120 Ohio St.3d 386, 2008-Ohio-6254, ¶ 30-32.

{¶ 44} Carpenter also relies upon *Rieger v. Montgomery Cty.*, Montgomery App. Nos. 23145 and 23162, 2009-Ohio-4125. In *Rieger*, we reversed the trial court's decision dismissing Rieger's consolidated actions against Montgomery County, in which he alleged that he had been wrongly deprived of the ability to buy a firearm under the federal Brady Handgun Violence Prevention Act, due to the existence of erroneous information on a "Brady Form 10 A" submitted to law-enforcement personnel, in case No. 07 CV 7374, and his action against the sheriff, seeking damages for a violation of his civil rights due to the erroneous "Brady Form 10 A," in case No. 08 CV 8912. The erroneous information at issue was that [Rieger] was "subject to a CSPO [civil stalking protective order] precluding him from harassing, stalking, or threatening an 'intimate partner.' " Id. at ¶ 8.

{¶ 45} Regarding his case against Montgomery County, Section 925A, Title 18, U.S.Code provides that any person denied a firearm " 'due to the provision of erroneous information relating to the person by any State or political subdivision thereof * * * may bring an action against the State or political subdivision responsible for providing the erroneous information * * * for an order directing that the erroneous information be corrected[.]'

**{¶ 46}** "Another federal statute, 18 U.S.C. §922(g)(8), prohibits the purchase of a firearm by any person subject to a court order that restrains the person 'from harassing, stalking, or threatening an intimate partner of such person * * * .' " Id. at ¶ 6-7. The trial court noted that the magistrate had found Rieger to be Brady disqualified in an underlying civil-stalking case, which Rieger unsuccessfully appealed, failing to raise the Brady disqualification as an issue. Since any objection to the firearm disqualification could and should have been raised on appeal from the civil-stalking case, and since the complaints in the consolidated cases "were predicated on the allegedly erroneous Brady disqualification," res judicata required dismissal. *Rieger,* 2009-Ohio-4125, ¶ 4.

**{¶ 47}** After reviewing the record in the civil-stalking case, we determined that "there is no finding anywhere in that case actually disqualifying Rieger under the Brady Act from purchasing a firearm. * * * That being so, we have no basis for determining that he could have raised his alleged Brady disqualification as an issue on appeal in the civil-stalking case. Because we are unable to conclude that Rieger could have raised a Brady argument as an issue in his civil-stalking appeal, we see no basis for applying the claim-preclusion branch of res judicata to his present complaints." Id. at ¶ 13.

**{¶ 48}** We further found the issue-preclusion branch of res judicata "equally inapplicable." *Rieger* 2009-Ohio-4125, ¶ 14. We noted that proof of the existence of an intimate relationship between the parties was not required to obtain a CSPO in the civil-stalking case. Id. We reasoned, "[T]he existence of an 'intimate partnership' or cohabitating relationship was not actually and directly at issue in the civil-stalking case. It follows that the entry granting the victim a CSPO in the civil-stalking case does not preclude Rieger from now seeking to establish that he and the victim were not intimate partners under the federal Brady Act. Therefore, res judicata does not bar him from seeking

16

relief under 18 U.S.C. § 925A on the basis that mistaken information wrongly deprived him of the ability to purchase a firearm. For the same reason, res judicata also does not preclude him from seeking money damages for the submission of the allegedly erroneous information to law-enforcement officials." Id. at ¶ 16.

{¶ 49} According to Carpenter, *Rieger* "is similar, but not exactly the same as this case. This court held that the prior litigation was based on a different substantive issue than the subsequent case. The same can be said for this action. The 2006 CV 885 case was solely to determine who was going to receive the monthly cell tower payments and it had nothing to do with who was negligent and the damages therein. The present 2008 CV 317 case concerns Appellee's misfeasance and the damages therein which occurred as a result of the misfeasance and could not be completely determined until the other case was completed."

{¶ 50} Finally, we review our recent decision in *Buckeye Retirement Co., L.L.C., Ltd. v. Busch,* Greene App. No. 2010 CA 51, 2011-Ohio-1125. Buckeye Retirement Co., L.L.C., Ltd. ("Buckeye") appealed from a summary judgment rendered in favor of Busch on the basis of res judicata. We determined that "the trial court erred in rendering summary judgment in Busch's favor. Busch was not a party to the prior action, which was an adversary proceeding between Buckeye and a debtor in bankruptcy. Busch is also not in privity with the debtor. Even under relaxed standards of mutuality of interest, Busch is not entitled to the benefit of res judicata, because he would not have been bound by a judgment rendered in the bankruptcy case." Id. at ¶ 2.

{¶ 51} The facts of *Busch* are as follows: in 2007, Buckeye sued Busch, Thomas Noland, and the law firm of Statman, Harris & Eyrich for money damages, claiming that Buckeye was the assignee and owner of all claims of a bank formally known as Provident. Provident made loans to Busch's

employer, U.S. Aeroteam, Inc. ("USAT"), between August and December 2003. Suhas Kakde was the president and majority shareholder of USAT, and he signed a promissory note on behalf of USAT and also personally guaranteed USAT's loans. Busch was the chief financial officer for USAT, and he prepared, signed, and forwarded financial information, statements, and certified documents to Provident in accordance with the financing agreement.

{¶ 52} In July 2003, Busch and Kakde met with Noland regarding USAT's potential bankruptcy. On Noland's instructions, USAT opened an account at another bank, the existence of which it concealed from Provident, and into which it deposited payments from accounts receivable. Busch then sent Provident false financial information that did not include the accurate amount of accounts-receivable payments that USAT had received.

{¶ 53} In late December, 2003, USAT filed for Chapter 11 bankruptcy. Thereafter, judgment was granted in Provident's favor against Kakde on the promissory note that Kakde had guaranteed. The judgment was assigned to Buckeye. When Kakde filed a personal-bankruptcy action, Buckeye objected to the discharge of Kakde's debt, and the bankruptcy court concluded that Buckeye did not establish that the debt was nondischargeable. Busch testified as a witness during the hearing on whether Kakde's debt to Buckeye was dischargeable.

{¶ 54} In 2010, Busch filed a motion for summary judgment in Buckeye's action against Busch, Noland, and the law firm, supported by Kakde's bankruptcy decision and Busch's affidavit, in which he averred that he was the "Busch" referred to in the *Kakde* decision. The trial court granted summary judgment for Busch. "The court concluded that although Busch was not a party to the *Kakde* litigation, the relationship between Busch and Kakde was 'close enough' to include Busch within res judicata. The court also concluded that while the claims in the *Kakde* case were '*styled*

18

differently' from the complaint against Busch, 'they reach the same conclusion.' * * * The court held, therefore, that Buckeye's claims against Busch were barred by res judicata." (Emphasis sic.) Id., ¶ 13. The claims against Busch were dismissed.

{¶ 55} On appeal, we held, "[T]here is no evidence that Busch either actively participated in, or had control over, the prior lawsuit. More importantly, Busch is a complete stranger to the bankruptcy litigation, and would not have been bound by a result in that case. Therefore, even under the most relaxed standard of mutuality of interests that has been employed, Busch was not in privity with Kakde, and is not entitled to the benefit of claim preclusion. For the same reason, Busch is not entitled to the benefit of issue preclusion, or collateral estoppel.

{¶ 56} "* * *

{¶ 57} "The correct standard is that in order for res judicata to apply, the parties must be the same or must be in privity with the parties to the prior action, as the term 'privity' has been interpreted by the Supreme Court of Ohio. Under the most recent interpretations of the meaning of privity, Busch - the party seeking to gain the benefit of res judicata - was not in privity with Kakde, the party to the prior action. Accordingly, the trial court erred in concluding that Busch and Kakde are in privity." *Busch*, 2011-Ohio-1125, ¶ 22, 25.

{¶ 58} After thoroughly considering all of the foregoing, we cannot conclude, as we did in *Hoover*, and as the Tenth District did in *McCrory*, that this matter presents a narrow exception to the general rule requiring mutuality of parties prior to the application of collateral estoppel. Carpenter is not asserting a contrary position to one previously taken, as did Hoover and the city of Cincinnati, and the judgment in the interpleader action is accordingly not preclusive upon her here. Carpenter seeks to litigate the damages she allegedly sustained due to Long's and Big Hill's alleged negligent

19

misrepresentation, professional negligence, and negligence, and on the basis of respondeat superior liability. According to her complaint, these damages were sustained as a direct result of Long's and Big Hill's failure to properly protect her interest in the rental income by recording that right and including it in the purchase contract. We cannot conclude that the issue of Long's and Big Hill's alleged negligence and any resulting damage is identical to what was actually litigated and directly determined by the interpleader action. To conclude otherwise would deny Carpenter the opportunity to be heard in a due process sense, and justice accordingly does not reasonably require that the mutuality rule be relaxed.

{¶ 59} Regarding *Davis*, we conclude that the "actual litigation" requirement set forth therein is not satisfied, and since Long's and Big Hill's alleged negligence has not been litigated, the interests of conserving judicial resources, maintaining consistency, and avoiding harassment carry less force.

{¶ 60} We agree that *Rieger* is similar to the matter herein in that in both instances, the prior litigation was based upon a different substantive issue. Rieger could not have raised a Brady argument as an issue in his civil-stalking appeal, because there was no finding in the record in that case disqualifying him from purchasing a firearm. Further, the existence of an intimate relationship was not at issue in the civil-stalking case. Herein, Carpenter could not have litigated Long's and Big Hill's alleged bad acts and the resulting damages therefrom in the interpleader action, because Long and Big Hill were not parties to that action. That action was filed by Cincinnati Bell Wireless for a determination of the proper recipient of the rental income, and Carpenter does not seek a redetermination of the issue adjudicated in the interpleader matter. Finally, in considering the requirement of privity discussed in *Busch*, we conclude that Long and Big Hill were not in privity with Cincinnati Bell Wireless but instead, like Busch, were complete strangers to the earlier

interpleader action.

{¶ 61} Accordingly, we agree with Carpenter that the trial court improperly applied the doctrine of res judicata. Having so found, however, we are nevertheless required to address the alternative grounds for summary judgment argued below. "The Supreme Court of Ohio has instructed that 'a reviewing court is not authorized to reverse a correct judgment merely because erroneous reasons were assigned as the basis thereof.' " *Snell v. Katafias* (Mar. 19, 1999), Montgomery App. No. 17440, 1999 WL 148229, *4, quoting *Joyce v. Gen. Motors Corp.* (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172. Long and Big Hill having asserted that alternative grounds exist justifying the grant of summary judgment in their favor, we will address those before we proceed to Carpenter's remaining assignments of error.

B. Alternative Grounds

{¶ 62} In their motion for summary judgment, Long and Big Hill asserted that the duties "owed by a real estate agent to sellers, buyers, or as a dual agent, do not reach transactions concerning the transfer of <u>personal property</u>. Rental income is personal property. * * * Without a duty, any negligence or 'professional negligence' claim against Long and Big Hill fails as a matter of law. Here, reasonable minds can only conclude that Ohio law does not contemplate the 'duty' allegedly breached by Long and Big Hill. Thus, summary judgment is warranted with respect to the negligence and 'professional negligence' claims asserted by Carpenter * * *."

{¶ 63} Long and Big Hill also asserted that Carpenter's claim for negligent misrepresentation "fails because neither Long nor Big Hill had a pecuniary interest with respect to the rental income. Indeed, their 'pecuniary interest' would arguably only be for the sale of real property, not the personal property." According to Long and Big Hill, the "justifiable reliance element fails because Carpenter

21

retained an attorney before the July 2006 sale to prepare three documents, which were intended to protect her right to receive the rental income. As such, if Carpenter claims Long never told her to secure a lawyer, there was no misrepresentation to rely upon because omissions do not give rise to a negligent misrepresentation claim." Long and Big Hill claim that "Carpenter sought the advice of her current lawyer who prepared documents that were intended to protect Carpenter's interests. Thus, Carpenter did not justifiably rely on any alleged statement from Long that he would take care of everything because she sought a lawyer to help her in spite of Long's alleged representation. Thus, reasonable minds can only conclude that Carpenter did not rely upon any alleged 'misrepresentation' from Long." Long and Big Hill argued on the other hand, "if Carpenter received the advice from Long, as he testified that she did, the 'false information' element fails because it is true that Carpenter needed to seek the advice of a lawyer, which she did. Thus, reasonable minds can only conclude that Carpenter cannot establish the 'false information' element." Finally, Long and Big Hill asserted that Carpenter's professional-negligence claim is barred by the statute of limitations.

{¶ 64} Attached to Long and Big Hill's motion for summary judgment are the affidavits of Long and of Cindy Jurcenko, an employee of Cincinnati Bell Wireless. Long's affidavit provides:

{¶ 65} "5. Ms. Carpenter wanted to retain her right to receive rental income from the telephone company. As a real estate agent, I lacked expertise in preparing and/or perfecting Ms. Carpenter's continued right to receive the rental income, since my responsibilities concerned the sale of the real property, not personal property.

{¶ 66} "6. I advised Ms. Carpenter to seek the advice of a lawyer in preparing and following through with the necessary requirements to protect her continued right to receive the rental income. Prior to the July 2006 closing with respect to the sale between Stoneridge and Arthur/Clymer, I

22

understood that Ms. Carpenter had retained the services of a lawyer in regard to protecting her right to receive the rental income as I had advised her to do. * * *

{¶ 67} "7. I was never asked by Ms. Carpenter or the lawyer she retained to hold up the sale to Arthur/Clymer for any reason. I had no reason to believe that the pertinent documents were not in place at the time of the July 2006 sale to Arthur/Clymer. I specifically told Mr. Arthur that neither he nor Clymer would have an interest in the rental income, even after the July 2006 sale was completed."

{¶ 68} In her affidavit, Jurcenko averred that she corresponded with Joseph Moore, Carpenter's attorney, concerning the preparation of the assumption agreement, assignment of rent payments, and assignment of lease. Attached to her affidavit are copies of her correspondence with Moore, which reveal that Moore sent her copies of the above documents on January 30, 2006, for her review, and on June 30, 2006, Jurcenko returned revised versions of the documents to Moore. Her June 30 correspondence provides: "I have also attached the Memorandum of Lease with the Exhibit B attached, which will be recorded." Also attached is a July 14, 2006 e-mail from Jurcenko to Moore, which provides that the "[p]artially executed MOL and Assumption Agreement" are attached and states, "[K]indly record and return the original MOL for our files." The email further states, "As I have mentioned to you in the past, a gentleman named Rick Arthur * * * has contacted me two times. Says he has a contract to purchase Anna's old home and the adjacent five (5) acres. His closing date is scheduled for July 31, 2006. His contract does not mention anything about the tower. He wanted information regarding the rental income. * * * I directed him back to Stoneridge Development."

{¶ 69} We will address Long and Big Hill's arguments in the order best suited for analysis.

1. Negligent Misrepresentation

{¶ 70} Carpenter asserted in her claim for negligent misrepresentation that at the closing of the

23

sale of the property to Stoneridge, the assumption agreement, assignment of lease, and assignment of rent payments were executed, but not recorded, and that she "stated that she had concerns about maintaining her rights to the rental payments. Defendant Long, in his capacity as her real estate agent, advised her that she had nothing to worry about." The complaint further avers that in the course of the sale to Arthur and Clymer, "Defendant Long did not check to see if the lease payment documents * * * had been recorded or to get them recorded prior to the closing on the sale with Arthur and Clymer." Finally, Carpenter's complaint states that she "justifiably relied on the representations made by Defendant Long that her rights to the lease payments would be protected and the documents would be recorded. Defendant Long, in his employment as dual real estate agent for all the various purchasers and sellers, placed himself in a position where he had control as to how the sales could occur and ensuring that proper notice was given to everyone pertaining to all aspects of the sales transactions."

{¶ 71} We note, "The elements of negligent misrepresentation are as follows: 'One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.' " *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4. "A negligent misrepresentation occurs when one '*supplies false information* for the guidance of others.' (Emphasis sic.) [*Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 149, 684 N.E.2d 1261.] In other words, a '[n]egligent misrepresentation does not lie for omissions; there must be some affirmative false statement. [123 Ohio App.3d 51, 702 N.E.2d 1246.]' " Id. *Leal v. Holtvogt,* (1998),

24

123 Ohio App.3d 51, 62, 702 N.E.2d 1246.

{¶ 72} According to Carpenter's deposition testimony, when she decided to sell the property, she told Long that she wanted to retain the cell-tower income after the sale and that she and Long "had the conversation about the cell tower every time [they] met."

{¶ 73} The following exchange occurred:

{¶ 74} "Q. * * * Now, when you had that first conversation about the cell phone tower in that thirty to forty-five minute meeting, what was said?

{¶ 75} "A. * * * when we sat and talked and he talked about what we would get out of the property or what I wanted and he'd try to get. * * *

{¶ 76} "* * *

{¶ 77} "A. And I said the only thing that is going to be for certain, George, is the money for the cell tower stays with me.

{¶ 78} "* * *

{¶ 79} "Q. And what was his response to that?

{¶ 80} "A. He said he understood that and he would take care of that for me."

{¶ 81} Carpenter testified, "George told me over and over every time we brought it up not to worry about a thing." She identified the purchase contract between her and Stoneridge, and the following exchange occurred as Carpenter reviewed the contract:

{¶ 82} "Q. Now, you see up there in the top where it indicates paragraph four and five, it says described as follows, 1955 Old North Fairfield Road containing eleven point four eight acres, excepting out the two point eight one three one acres, the cell tower, and the two point zero five one seven acres lots.

{¶ 83} "* * *

{¶ 84} "Q. Do you have any reason to dispute that that language was not included on the contract to purchase before you signed it?

{¶ 85} "A. No, I believe it was correct.

{¶ 86} "Q. And that fairly and accurately represents the conditions you wanted to have in place with respect to the sale of the property, does it not?

{¶ 87} "A. Yes."

{¶ 88} When asked if she believed that any additional steps were needed to complete the transaction, Carpenter stated, "No. [Long] just told me not to worry about a thing because he would take care of everything for me, and I believed him at the time." The following exchange occurred:

{¶ 89} "Q. * * * What was your understanding as to take care of everything? What was your understanding as to what that meant?

{¶ 90} "A. That he was going to be true to his word with the cell tower rental, and when we went to the closing he told me not to worry about anything, so I didn't worry about anything.

{¶ 91} "* * *

{¶ 92} "Q. Now, did George talk to you about needing to seek legal advice with respect to closing off any of the terms and conditions - -

{¶ 93} "A. No, he didn't."

{¶ 94} Counsel for Long presented Carpenter with a copy of the June 8, 2006 Assumption Agreement, and Carpenter testified that she did not remember the document. When asked if she had an understanding of the purpose of the document, Carpenter responded, "No, I don't know." Carpenter identified her signature on the June 8, 2006 Assignment of Lease (Exhibit H) and on the

26

June 8, 2006 Assignment of Rent Payments (Exhibit I).

**{¶ 95}** Regarding the Assignment of Rent Payments, the following exchange occurred.

**{¶ 96}** When Carpenter was asked for her understanding of the document, she said:

**{¶ 97}** "A.  I thought it was taking care of the rental.

**{¶ 98}** "Q.  Right.  And so I want to make sure I understand what you're telling me. * * * [W]ould you agree with me that H and I are the documents that would have been put together to make sure that you had the rental income coming to you each month?

**{¶ 99}** "* * *

**{¶ 100}** "A.  No.  I don't think that would take care of everything.  It should have been taken care of to my - - the way I feel about it on the contract Clymers (sic) made with George."

**{¶ 101}** Long testified at deposition that "quite a while before the closing," he recommended to Carpenter that she have a legal document prepared to protect her interest in the rental income and that Carpenter indicated that "she would do it."

**{¶ 102}** Regarding Long and Big Hill's assertion that Carpenter's negligent-misrepresentation claim fails because they lacked a pecuniary interest in the transfer of the rental income, Carpenter identified the January 23, 2004 Exclusive Right to Sell contract between her and Big Hill Realty, which provides that Carpenter will pay a 6.00 percent brokerage fee to Big Hill upon the sale of the property, and we cannot conclude that Long and Big Hill lacked a pecuniary interest in the transaction as a matter of law.

**{¶ 103}** Regarding Long and Big Hill's argument that "omissions do not give rise to a negligent misrepresentation claim," we note that Carpenter's complaint asserts that Long represented to her that he was taking care of everything and that the documents protecting her rights to the rental

27

income would be recorded, and Long's alleged failure to advise Carpenter to retain legal counsel is not a basis of her negligent-misrepresentation claim.

{¶ 104} Regarding Long and Big Hill's assertion that Carpenter cannot satisfy the "false information" element of her negligent-misrepresentation claim, because Long allegedly told her to seek legal advice, and "it is true that Carpenter needed to seek the advice of a lawyer," we again note that Long's alleged failure to advise Carpenter to seek legal advice does not form a basis of her claim.

{¶ 105} Finally, Long and Big Hill assert that Carpenter cannot satisfy the justifiable-reliance element of her negligent-misrepresentation claim because she retained an attorney to draft the assumption agreement, assignment of lease, and assignment-of-rent payments, thereby to protect her interests, allegedly belying her claim that she relied upon Long to do so. Carpenter's testimony is clear that Long repeatedly told her that he himself would protect her interests, and her complaint alleges that Long represented to her that "the documents would be recorded." Long asserted that protecting her interest in the income was beyond his expertise, that he advised her to seek a lawyer, and that he "had no reason" to conclude that the documents protecting her interest were "not in place" at the Arthur/Clymer closing. We conclude that genuine issues of material fact exist regarding the representations made by Long to Carpenter and her reliance thereupon, and viewing the evidence most strongly in favor of Carpenter, we cannot conclude as a matter of law that her reliance upon Long's alleged representations was not justified.

## 2. The Statute of Limitations

{¶ 106} Long and Big Hill asserted that Carpenter's claim for professional negligence is barred by the statute of limitations set forth in R.C. 2305.11. We disagree. R.C. 2305.11(A) provides that "an action for malpractice other than an action upon a medical, dental, optometric, or chiropractic

28

claim * * * shall be commenced within one year after the cause of action accrued."  R.C. 2305.09(D) provides that an action for "an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 1304.35, 2305.10 to 2305.12, and 2305.14 of the Revised Code" shall be brought within four years after the cause of action accrued.

{¶ 107} In *Thompson v. Community Mental Health Ctrs. of Warren Cty., Inc.* (1994), 71 Ohio St.3d 194,  the Supreme Court of Ohio noted that it "is well-established common law of Ohio that malpractice is limited to the negligence of physicians and attorneys."  "In a long line of cases interpreting R.C. 2305.11, Ohio courts have consistently refused to extend the statute of limitations to include malpractice claims which are neither specifically enumerated in the terms of the statute nor included in the common-law definition of 'malpractice.' " (Citations omitted.)  *Doe v. White* (1994), 97 Ohio App.3d 585, 590.  "Thus, other actions of professional negligence are treated as negligence and governed by the statute of limitations in either R.C. 2305.09 or 2305.10."  Id.  Since Carpenter's second claim for relief does not allege malpractice but rather professional negligence, Long and Big Hill's reliance upon R.C. 2305.11(A) is misplaced, and R.C. 2305.09(D) instead applies.  Because Carpenter's professional-negligence claim is not untimely, Long and Big Hill are not entitled to summary judgment as a matter of law on the basis of the statute of limitations.

### 3.  The Duty Element of Negligence

{¶ 108} In her professional-negligence claim, Carpenter asserted that Long "had a duty as a real estate agent to conduct himself in a professional manner which includes protecting [her] interests * * * even after the closing which occurred on June 8, 2006, because her interest was not fully divested and required his expertise and due care to protect her rights to the rental payments."  Carpenter further asserted that Long had "failed to exercise his professional duty and care to protect

29

[her] interest by: failing to ensure that the documents pertaining to [her] rights to the rental payments had been recorded; failing to write anything in the sales contract with Arthur and Clymer and notifying them of [her] rights; and proceeding forward with the subsequent closing on the property in question without investigating whether the pertinent documents had been recorded prior to the sale/closing of July 14, 2006." In her claim for negligence, Carpenter asserted that Long failed to exercise ordinary care.

{¶ 109} In support of their assertion that Carpenter cannot satisfy the duty element of her negligence claims, Long and Big Hill relied upon several sections of R.C. Chapter 4735, as well as case law addressed to the statute of frauds. R.C. 4735.52 provides: "Except to the extent the duties of a real estate agent are specifically set forth in this chapter, or are otherwise modified by agreement, the duties of a real estate agent are determined by the common law." Long and Big Hill further directed the court's attention below to R.C. 4735.51(A), which provides, " 'Agency' and 'Agency relationship' mean a relationship in which a licensee represents another person in *a real estate transaction*." (Emphasis added.) R.C. 4735.01 similarly defines a real estate broker in part as one who, for a "fee, commission, or other valuable consideration," engages in *a real estate transaction*.

{¶ 110} Long and Big Hill also relied upon the following case law, which they argued established the nature of the rental income as personal property beyond the scope of the real estate transaction(s): *Nonamaker v. Amos* (1905), 73 Ohio St. 163, 171, 76 N.E. 949 (an agreement to increase or decrease the royalty on an oil lease is not within the statute of frauds because "when the parties entered into the parol contract, * * * they were not contracting for an interest in or concerning real estate, but for a division of personal property in proportions different from those named in the written lease"); *Negley v. Jeffers* (1875), 28 Ohio St. 90, 100 ("Where a deed has been executed, or a

title in any way passed, agreements between the parties as to pecuniary liabilities growing out of the transaction, but not going to take any interest in the land from the grantee, are not affected by the statute of frauds"); *Robnolte v. Kohart* (1947), 81 Ohio App. 1, 76 N.E.2d 913, paragraph two of the syllabus ("When parties in interest agree to sever and remove buildings from the realty, such buildings are held and treated as personalty for the reason that title to the land is in no wise involved, nor is any interest or estate therein, and therefore does not involve a contract within the statute of frauds"). Counsel for Long asked Carpenter about Long's duty to her in deposition, and the following exchange occurred:

{¶ 111} "Q. * * * Now, you've made certain allegations against George, and I want to ask you what it is that you think he did to breach his duty to you?

{¶ 112} "A. Well, he knows what he did. He didn't put it in the contract.

{¶ 113} "Q. He didn't put what in the contract?

{¶ 114} "A. That the rental was supposed to go to me, and he did not put it in their - - the Clymers' [sic]contract. If they'd have signed the contract with that in there, we wouldn't be here today. That's my feelings. * * * He called my daughter afterwards, after we found out that it wasn't in their contract and apologized to her and told her he made a big mistake."

{¶ 115} We initially note, "It is well settled that the elements of an ordinary negligence suit are (1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach. *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, [¶ 22] citing *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318. The duty element of negligence is a question of law for the court to determine. Id.

{¶ 116} "The Ohio Supreme Court has explained the 'duty' element of a negligence claim as

31

follows:

{¶ 117} " 'Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff. This court has often stated that the existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied. In addition, we have also stated that the duty element of negligence may be established by common law, by legislative enactment, or by the particular circumstances of a given case.' " *State Farm Fire & Cas. Co. v. Century 21 Arrow Realty*, Cuyahoga App. Nos. 87081, 87108, 2006-Ohio-3967, ¶ 29, quoting *Wallace,* 96 Ohio St.3d 266, ¶ 23 (reversing grant of summary judgment in favor of Century 21 and its agent on plaintiff sellers' negligence claims and holding that plaintiffs established the duty element of negligence as a matter of law).

{¶ 118} "It is well settled that a real estate agent owes a fiduciary duty to his client. The statutory fiduciary duties owed by a real estate agent to his client * * *are set forth in R.C. 4735.62. [2] * * * This list is not exhaustive.

{¶ 119} "In addition to the statutory duties that are imposed, a real estate agent must still abide by the common law fiduciary duties. Indeed, ' "real estate brokers have statutory and common law

---

[2]R.C. 4735.62 provides: "In representing any client in an agency or subagency relationship, the licensee shall be a fiduciary of the client and shall use the licensee's best efforts to further the interest of the client including, but not limited to, doing all of the following:
"(A) Exercising reasonable skill and care in representing the client and carrying out the responsibilities of the agency relationship;
"(B) Performing the terms of any written agency agreement;
"(C) Following any lawful instructions of the client;
"(D) Performing all duties specific in this chapter in a manner that is loyal to the interest of the client;
"(E) Complying with all requirements of this chapter and other applicable statutes, rules, and regulations, * * *
"(F) Disclosing to the client any material facts of the transaction of which the licensee is aware or should be aware in the exercise of reasonable skill and care and that are not confidential information pursuant to a current or prior agency or dual agency relationship;
"(G) Advising the client to obtain expert advice related to material matters when necessary or appropriate;
"(H) Accounting in a timely manner for all moneys and property received in which the client has or may have an interest;
"(I) Keeping confidential all confidential information * * *."

fiduciary duties of disclosure, good faith, and loyalty." ' *Hornung v. Fletcher*, Mahoning App. No. 05MA07, 2005-Ohio-7078, ¶ 12 quoting *Whaley v. Zyndorf/Serchuk, Inc.*, 6th Dist. No. L01 1295, 2002-Ohio-2640, ¶ 8. ** * We also recognize that the common law duty of due care is 'that degree of care which an ordinarily reasonable and prudent person exercises, or is accustomed to exercising, under the same or similar circumstances.' *Mussivand*, 45 Ohio St.3d at 318.

{¶ 120} "Furthermore, the Ohio Supreme Court has held: 'One who acts as an agent for another becomes a fiduciary with respect to matters within the scope of the agency relation. An agent owes his principal a duty to disclose all material information which the agent learns concerning the subject matter of the agency relation and about which the principal is not apprised. Furthermore, where a principal suffers loss through his agent's failure to function in accordance with his duty, the agent becomes liable to the principal for the resulting damages.' (Citations omitted.) *Miles v. Perpetual Savings & Loan Co.* (1979), 58 Ohio St.2d 93, 95." *State Farm*, 2006-Ohio-3967, ¶ 32-34.

{¶ 121} Finally, "a fiduciary can assume a duty that is 'created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.' *Nilavar v. Osborn* (1998), 127 Ohio App.3d 1, 20, quoting *Strock v. Pressnell* (1988), 38 Ohio St.3d 207, 216." *State Farm* at ¶ 36.

{¶ 122} Having considered the extensive fiduciary duties imposed upon real estate agents by R.C. 4735.62, as well as those imposed by common law, as set forth in *State Farm*, and having considered the facts herein, we cannot conclude as a matter of law that Carpenter failed to establish a duty. *Nonamaker*, *Negley* and *Robnolte* address the application of the statute of frauds to agreements that do not involve the transfer of real property and have no application herein. R.C. 4735.01(B) very broadly defines real estate as follows: " 'Real estate' includes leaseholds as well as any and every

33

interest or estate in land situated in this state, whether corporeal or incorporeal, whether freehold or nonfreehold, and the improvements on the land, but does not include cemetery internment rights." See *St. Bernard Self-Storage v. Hamilton Cty. Bd. of Revision*, 115 Ohio St.3d 365, 2007-Ohio-5249, ¶ 24. We cannot conclude that Carpenter's leasehold was beyond the scope of Long's duties as a matter of law.

{¶ 123} Further, while Jurcenko's correspondence with Moore confirms that Carpenter engaged an attorney to address preserving her rights to the income, construing the evidence most strongly in favor of Carpenter, we find that Long specifically advised her that he himself would take care of everything and that her interest in the rental income would be protected and recorded. Carpenter's version of events, if accepted by the trier of fact, would establish the assumption of a duty by Long regarding the protection of Carpenter's interest, accompanied by the attendant duties of good faith, loyalty, and due care. If Long assumed the duty, which he disputes, his protection of Carpenter's interest in the rental income was an inherent part of the real estate transaction(s) and within the scope of the agency relation. Accordingly, we cannot conclude that Long and Big Hill are entitled to summary judgment on Carpenter's negligence claims.

{¶ 124} Because Long and Big Hill are not entitled to summary judgment on the alternative grounds that they asserted below, we will next address Carpenter's remaining assignments of error, which we will consider together. They are as follows:

{¶ 125} "The trial court erred as a matter of law by confirming the magistrate's decision without conducting an independent review of the motion for summary judgment and memorandum in opposition therein and properly applying the requirements of Ohio Civil Rule 56."

{¶ 126} And

{¶ 127} "The trial court erred as a matter of law in granting summary judgment by misapplying principles of an action of interpleader and Ohio Civil Rule 22 and thereby preventing this action from proceeding forward."

{¶ 128} And,

{¶ 129} "The trial court erred as a matter of law by not applying the proper principles of mediation and thereby preventing this action from proceeding forward."

{¶ 130} Having found that Carpenter's claims are not barred by res judicata, and having sustained Carpenter's first assignment of error, analysis of Carpenter's remaining assignments of error is rendered moot.

## II. Arthur and Clymer's Appeal

### A. Res Judicata

{¶ 131} Arthur and Clymer's sole assignment of error is as follows:

{¶ 132} "The trial court erred in granting summary judgment to appellees on all claims and finding no dispute of fact raised in the summary judgment pleadings."

{¶ 133} As discussed above at length in the analysis of Carpenter's appeal, since the issues of Long's, Big Hill's, and Stoneridge's alleged misfeasance and Arthur's and Clymer's resulting damages have not been decided, and since, pursuant to *Busch*, Long, Big Hill, and Stoneridge are not in privity with Cincinnati Bell Wireless, the trial court erred in rendering summary judgment in favor of the appellees on the basis of res judicata. Having so found, as in Carpenter's appeal, we must address the alternative grounds for summary judgment. See *Snell*, Montgomery App. No. 17440. Long, Big Hill, and Stoneridge asserted below that alternative grounds exist justifying summary judgment in their favor against Arthur and Clymer. We will first address the alternative grounds

35

argued below by Long and Big Hill, and then we will address the alternative grounds argued by Stoneridge.

B. Long and Big Hill's Alternative Grounds

**{¶ 134}** Long and Big Hill asserted that they satisfied their obligations under Ohio law to Arthur and Clymer. Long and Big Hill maintain, "Arthur and Clymer's claims fail as a matter of law because there was no obligation to 'except' rental income, [Arthur and Clymer] had actual notice of Carpenter's right to the rental income and [Arthur and Clymer] did not sustain damages." We discuss Long and Big Hill's assertions in the order best suited for analysis.

1. Actual Knowledge

**{¶ 135}** Long and Big Hill claimed that "Arthur is chargeable with notice and is precluded from avoiding the effect of Carpenter's ownership of the rental income," relying upon *Schloss v. Brown* (1920), 13 Ohio App. 294 ("It is the settled rule in Ohio that a purchaser of land which is in the actual possession of a third party, known to him, is chargeable with notice of any equitable title of the party in possession whatever the same may prove to be"). According to Long and Big Hill, "even if a lease is unrecorded, knowledge of its existence makes such an instrument valid as against an alleged *bona fide* purchaser," in reliance upon *Four Howards, Ltd. v. J & F Wenz Rd. Invest., L.L.C.*, 179 Ohio App.3d 399, 2008-Ohio-6174, ¶ 62, quoting *Schwieterman v. Feltz* (Dec. 22, 1986), 2d Dist. No. 9964, 1986 WL 15307, 3 (" 'even if a lease is unrecorded, a grantee need not know its specific terms in order "to be bound thereby so long as he knows of its existence." ' ") Long and Big Hill asserted that Arthur and Clymer never indicated that they would not close on the sale unless the rental income was included, and Arthur and Clymer "understood that the phone company owned the tower and Carpenter was getting the rental income," and the cell tower income was not an important part of

36

the sale.

{¶ 136} Arthur and Clymer counter that "[a]ctual knowledge of the existence of the instrument reassigning the future rentals to Anna Carpenter would be required before the unrecorded reassignment would lose its fraudulent character as to the buyers * * *." They asserted that they were unaware of the existence of the assignment-of-rents instrument, and they maintained that the assignment of rents was executed after they signed the contract to purchase the property. They also asserted that Long told them that a release was being prepared for their signatures, which "only served to reinforce the idea that Arthur and Clymer indeed had those rights unless they followed through with the request that they release them."

{¶ 137} R.C. 5301.25 provides that unrecorded instruments "are fraudulent, so far as relates to a subsequent bona fide purchaser having, at the time of purchase, no knowledge of the existence of that former deed or land contract or instrument." "An unrecorded land use restriction is not enforceable against a bona fide purchaser for value unless the purchaser has actual knowledge of the restriction." *Emrick v. Multicon Builders, Inc.* (1991), 57 Ohio St.3d 107, at syllabus.

{¶ 138} According to Arthur's deposition testimony, in response to questions from counsel for Long, he and Clymer initially met Long at the property on May 30, 2006, and Clymer "used the word dump to characterize" the property, and she "was reluctant, and then she asked George Long about the cell tower. And he said that he didn't - - let's see. I don't know - - I don't recall the exact - - if she asked how much it made or anything, but the - - I do know that Long said that Anna gets the rights or the rents for now."

{¶ 139} Arthur testified that in the course of the initial visit, he did not ask Long about the cell tower, and that Long did not indicate that the cell tower or the rental income was included in the sale.

37

Arthur testified that he did not ask Long about the legal rights to the income, and he stated that he would have closed on the property regardless of those rights.

{¶ 140} The following exchange occurred:

{¶ 141} "Q. * * * Now, is it fair to say that you being knowledgeable about real estate, I mean, you probably realized that the cell tower is not part of the real property?

{¶ 142} "A. I didn't know that.

{¶ 143} "Q. You didn't think you were buying a cell tower, did you?

{¶ 144} "A. I didn't know that. I never bought a property with a cell tower on it. * * *

{¶ 145} "* * *

{¶ 146} "Q. When you told George Long that you wanted to make an offer on the property, you didn't say: I want you to include the cell tower or its proceeds in the offer to purchase?

{¶ 147} "A. Correct."

{¶ 148} The purchase contract provides, "The property shall include the land, all pertinent rights, privileges and easements, all buildings, improvements and fixtures, including but not limited to such of the following as are now on the property: All electrical, heating, plumbing and bathroom fixtures, all window and door shades, blinds, awnings and screenings, storm windows and doors, television antenna, curtain rods, garage door opener and control, all landscaping," followed by a blank line, and Arthur testified that he did not ask Long to insert anything that was not already included on the contract. The contract further provides, "6. POSSESSION. Rentals, interest on any assumed mortgages, water and other utility bills, and any current operating expenses shall be prorated as of the date of closing."

{¶ 149} Arthur testified that Long never told him that the cell-tower income was included in

the purchase, and Arthur stated that he never told Long that it needed to be included as part of the sale. The following exchange occurred:

{¶ 150} "Q. Between the first time you went to the property and the date of closing, did you ever discuss at all the cell tower with George Long?

{¶ 151} "A. He contacted me twice that there were papers being drawn up that they wanted me to sign to release my rights to the cell tower income.

{¶ 152} "* * *

{¶ 153} "Q. And what was your response?

{¶ 154} "* * *

{¶ 155} "A. I felt that was odd, that I would have to sign a release to something that maybe I felt that I deserved. * * *

{¶ 156} " * * *

{¶ 157} "Q. You thought: Well, if I'm releasing something, then I must have had a right to it to begin with?

{¶ 158} "A. Yes."

{¶ 159} The following exchange occurred regarding the closing of the sale:

{¶ 160} "Q. Did you discuss at all, with anyone at the closing, the cell tower or the cell tower proceeds?

{¶ 161} "A. Some kind of conversation about the release. I may have asked did they bring a release to sign or something, I don't know. * * * It seems that it was that [title agent] Lynn Compton said that there was no release on file, * * *

{¶ 162} "She had looked for that and there was no record of that recorded. And there was no

release ever brought to her office for me to sign.

{¶ 163} "Q.  So you asked this question of Lynn at the closing?

{¶ 164} "* * *

{¶ 165} "A.  Yes.

{¶ 166} "Q.  For you to sign?

{¶ 167} "A.  Or I stated that they never gave me that release to sign, they never came forward with it.

{¶ 168} "Q.  Well, if they had given you a release to sign, what would you have done?

{¶ 169} "A.  I don't think Chanin would have wanted me to sign it.

{¶ 170} "Q.  You don't think so?

{¶ 171} "A.  She told me that she didn't like the property, you know, the work that it needed, and that if it didn't - - don't get any income from that cell tower, it wouldn't be worth it.

{¶ 172} "Q.  So you weren't going to do it, you weren't going to buy the property?

{¶ 173} "A.  That was her desire.

{¶ 174} "Q.  What were you going to do?  That's my question.

{¶ 175} "A.  If they gave me the release?

{¶ 176} "Q.  Yes.

{¶ 177} "A.  Take it to a lawyer.

{¶ 178} "Q.  Would you have gone through with the sale or you would have just gone through with the sale and then argued - -

{¶ 179} "A.  I would have reevaluated it.  I had no decision on that at that time.

{¶ 180} " * * *

{¶ 181} "Q.  One thing we do know is that you never told anybody that: If I have to sign that release, I'm not going through with the sale?

{¶ 182} "A.  Correct."

{¶ 183} Arthur testified that he "tried asking Cindy Jurcenco, at Cincinnati Bell, anything about the contract, and she wouldn't divulge anything, other than that Anna Carpenter has an income and wouldn't tell me the amount or anything."  Arthur stated that at the time of the closing he knew that Cincinnati Bell Wireless owned the cell tower and that Carpenter was receiving the rental income.

{¶ 184} Long and Big Hill directed the trial court's attention to the following exchange:

{¶ 185} "Q.  And once you found that out and you had concerns about whether you were entitled to those rental payments instead, did you ever ask to postpone the closing on the property?

{¶ 186} "A.  No, I didn't."

{¶ 187} Arthur's affidavit, attached to Arthur and Clymer's memorandum in opposition to Long and Big Hill's motion for summary judgment, provides, "Mr. Long * * * proceeded to prepare a purchase agreement offer for Chanin and I to sign, which made no exclusion of our right as purchasers to receive the rentals after we owned the property, but instead expressly provided for a pro-ration of rentals to the date of closing."  Arthur averred that Long did not tell him and Clymer that Carpenter would continue to receive the rental income after she sold the property to Stoneridge, and he did not advise them of "the existence of any instruments reserving the rentals or assigning the rentals to Anna Carpenter."  Arthur avers that after the counteroffer was accepted, Long advised Arthur that a release regarding the cell-tower income was being prepared for his signature.  According to Arthur's affidavit, when "no release was presented at the closing, I believed that Stoneridge had realized that it

41

was obligated to honor the terms of the purchase agreement and because the deed did not exclude the cell tower land rentals or otherwise reserve those to Anna Carpenter, I accepted the deed from Stoneridge." Arthur averred that his mortgage broker, "Deborah Eick, and our title agent, Lynn Thompson, both advised us that they knew of no right that Stoneridge had which would entitle Stoneridge to change the essential terms of our purchase agreement after it had been offered and accepted. They further advised that the Greene County Recorder's Office had no recorded documents reserving or assigning the cell-tower land rentals to Anna Carpenter, and cautioned us about signing any such release document." Finally, Arthur avers that at "the time of our closing on July 14, 2006, I had actual knowledge that Stoneridge had for a time attempted to change the terms of our purchase agreement, but I had no actual knowledge of the existence of an Assignment instrument, whereby Stoneridge had previously assigned the rentals back to Anna Carpenter."

{¶ 188} In her deposition, Clymer's testimony was consistent with Arthur's that Long told her, when she inquired about the cell tower, that "he just said Anna had those rights for now." When asked what she would have done if she learned that she and Arthur were not entitled to the cell-tower income, Clymer replied, "Probably wouldn't have had my name on the deed because I wouldn't have gone through with it probably." Clymer stated that she believed the rights to the cell-tower income passed from Carpenter to Stoneridge to her and Arthur, and "it was more like it ran with the land from what I was investigating, the landowner would be in rights of that." Clymer further averred, in "the counter offer by Stoneridge signed June 6th, 2006, there was no proposed change to the purchase agreement regarding the cell tower land rentals, but our purchase of the property was made contingent on Stoneridge's purchase of the property from Anna Carpenter as Stoneridge had not yet closed on its purchase from Anna Carpenter."

**{¶ 189}** In his deposition, Long testified that Arthur and Clymer "were made aware that there was a document being prepared that would divide the proceeds from the cell tower, that Mrs. Carpenter would retain the income from the cell tower and that the cell tower would remain standing. And he would receive no proceeds from that."

**{¶ 190}** The following exchange then occurred:

**{¶ 191}** "Q. And who made them aware?

**{¶ 192}** "A. I made that statement on four occasions.

**{¶ 193}** "Q. That there would be a writing; is that what you're saying?

**{¶ 194}** "A. That - - yes, something would be forthcoming that would clearly define the relationship to the cell tower.

**{¶ 195}** "Q. Was that ever presented to Arthur and Clymer?

**{¶ 196}** "A. Not to my knowledge."

**{¶ 197}** Long testified that he did not attend the closing of the sale between Stoneridge and Arthur and Clymer, nor did a representative of his office. According to Long, "the closing was rushed" at Arthur's request to preserve an interest rate on his loan, and it "happened after hours."

**{¶ 198}** Having reviewed the above evidence, we conclude that a genuine issue of material fact exists regarding whether Arthur and Clymer had actual knowledge that the rights to the rental income were to remain with Carpenter. The contract provided for the proration of rentals, and the cell-tower income was the only rental income from the property. While Long avers that he specifically told Arthur that he and Clymer were not entitled to the rental income, Arthur's testimony is consistent with Clymer's that Long stated that Carpenter was receiving the income "for now," at a time when she still owned the property. While Arthur and Clymer were advised that a release was

43

being prepared for their signature, suggesting to them that such a document was required to sever the interest in the income from the property, one was not executed prior to or at closing. Arthur and Clymer proceeded to closing, and they argue that in the absence of a release, they believed that the right to the income was theirs. Long did not aver that he made Arthur and Clymer aware of the assignment of future rents between Stoneridge and Carpenter. Clymer testified that she would not have gone through with the sale in the absence of the income, and Long's testimony is inconsistent, in that he stated that he would have closed regardless of the income, and later that he would have reevaluated the transaction if presented with a release. Because a genuine issue of material fact exists regarding Arthur's and Clymer's actual knowledge, Long and Big Hill are not entitled to summary judgment on that basis.

{¶ 199} Lastly, Long and Big Hill's reliance below upon *Schloss v. Brown*, 13 Ohio App. 294, is misplaced. Schloss had been a tenant on property that was later sold. After the sale, Schloss filed an action for specific performance to enforce his rights as a tenant. *Schloss* involved the rights of the tenant in possession, and not, as here, the rights of the purported successor lessor.

2. Duty

{¶ 200} In their complaint, Arthur and Clymer asserted that Long and Big Hill had "breached their agency duties to [them] as dual agent, failing to except the cell tower rentals from the written purchase agreement and failing to except the cell tower rentals from the warranty deed delivered by said defendants to the closing agent on or about July 14, 2006." Additionally, they asserted that Long and Big Hill breached their duties to exercise ordinary care to protect their interests.

{¶ 201} In their motion for summary judgment, Long and Big Hill asserted, again, that the contract to purchase real estate "concerned the transfer of real property, not personal property."

44

According to Long and Big Hill, "Arthur/Clymer has no evidence as to how Long breached his duty to Arthur/Clymer regarding 'excepting' the cell tower proceeds or that Long failed to protect Arthur/Clymer's interests." Long and Big Hill relied upon the following language in the contract between Stoneridge and Arthur and Clymer: "Seller shall furnish a transferable and recordable general warranty deed conveying to purchaser * * * a marketable title to the Property * * * free and clear of all liens, rights to and encumbrances whatsoever, **except * * *** (d) **rights of tenants in possession** which would not prevent Purchaser from using the Property for the following purpose: residential." (Emphasis added.) Finally, Long and Big Hill argued, "[I]t is undisputed that the contract to purchase did not contemplate the transfer of monthly rental income to Arthur/Clymer. Therefore, reasonable minds can only conclude that neither Long nor Big Hill had an obligation to specifically 'except' the rental income from the July 2006 sale."

{¶ 202} Long and Big Hill directed the trial court's attention to the following exchange:

{¶ 203} "Q. The allegations you made against George Long is that he breached his duty to you to except the cell tower proceeds from the purchase contract. How did he breach his duty to you, his agency duty to you?

{¶ 204} "A. Gosh, I wouldn't know how to answer that question.

{¶ 205} "Q. You saw the purchase contract before he submitted it to the seller, right?

{¶ 206} "A. Yes.

{¶ 207} "* * *

{¶ 208} "Q. All right. Are you saying that he should have included on there that the cell tower proceeds were not included in your purchase?

{¶ 209} "A. Everyone's opinion to me was that if it was on that contract, then the rights of

45

that income from the cell tower goes with the real estate purchase. And so if that's the law, and, in view of that, then I would have to answer that, yes, he should have written that."

{¶ 210} In their memorandum in opposition to Long and Big Hill's motion for summary judgment, Arthur and Clymer relied upon section 6 of the contract to purchase real estate between them and Stoneridge, which provides in part for the proration of "rentals." Arthur and Clymer asserted that Long and Big Hill "may have in error believed that their status as dual agents nullified any affirmative duty to speak to the buyers. Even was [sic]) that the case, the retention of the rental prorations clause as part of the purchase agreement prepared by George Long went well beyond mere silence for which the realtors are clearly answerable." Attached to their memorandum in opposition is the affidavit of Lynne Compton, the owner of Summit Land Title, confirming Arthur's testimony that she "cautioned" Arthur against releasing his rights to the income, because there was no interest in the income of record.

{¶ 211} We initially conclude, for the reasons discussed in Carpenter's appeal, that the rental income is not outside the scope of the real estate transaction. The record reflects that Arthur, Clymer, and Stoneridge signed an agency disclosure statement, thereby consenting to Long's dual representation of the interests of the buyers and seller in the transaction. As noted in Carpenter's appeal, as a real estate agent, Long owed extensive fiduciary duties to Arthur and Clymer. Construing the evidence most strongly in favor of Arthur and Clymer, we note that Long advised them that Carpenter was receiving the rental income "for now," at a time when Carpenter still owned the property; the closing of the sale between Stoneridge and Arthur and Clymer was contingent upon the closing of the sale between Carpenter and Stoneridge. Long advised Arthur that a release of their rights to the rental income was being prepared for his and Clymer's signatures, thereby implying to

them that the rights to the rental income, in the absence of such a release, would belong to them as successor lessors. The contract provided that Cincinnati Bell Wireless had a right to maintain its cell tower on the property, as a tenant in possession, but the contract also expressly provided for the proration of rentals at closing. Because the contract expressly provided for the proration of rentals, and because Arthur and Clymer were unaware of the assignment of rents, we cannot say as a matter of law that Long did not breach his duties to Arthur and Clymer when he failed to affirmatively exclude the rental income from the transaction. Accordingly, Long and Big Hill are not entitled to summary judgment on this alternative basis.

### 3. Estoppel

{¶ 212} Long and Big Hill argued, without elaboration, that the "cell tower income was not an important part of the sale," and that "before Arthur signed the contract, he had no problems with how it was written up. Accordingly, estoppel principles preclude Arthur/Clymer's objections to how the sale occurred." Long and Big Hill seem to argue that Arthur and Clymer, in accepting the contract as written, without a provision specifically granting them an interest in the cell-tower income, waived the right to challenge the contract. Since the purchase contract provided for the proration of rental income, we find that this argument lacks merit.

### 4. Damages

{¶ 213} In their complaint, Arthur and Clymer asserted that they "were damaged to the extent of the cell tower rentals assigned to Arthur and Clymer under the terms of the Interpleader settlement and to the extent of the attorney fees and costs incurred by Arthur and Clymer in defending that action."

{¶ 214} In their motion for summary judgment, Long and Big Hill asserted below that it "is

undisputed that had Long and Big Hill done what Arthur/Clymer allege they were required to do, Arthur/Clymer would be entitled to nothing, i.e., Arthur/Clymer is in a better position because of the alleged breach than had it not occurred." This argument is flawed. Clymer's testimony establishes that she would have refused to sign a release had one been presented to her: "I don't feel it would have been a good investment. We wouldn't have gotten anything in return, and I have the noise of the cell tower, the traffic in and out on the cell tower."

{¶ 215} Having determined that Long and Big Hill are not entitled to summary judgment on Arthur and Clymer's claims, we cannot conclude that Arthur and Clymer did not sustain damages as a result of Long's conduct. There is a genuine issue as to whether Arthur and Clymer were damaged to the full extent of the rental income. Accordingly, Long and Big Hill are not entitled to summary judgment on this basis.

{¶ 216} Having found that Arthur and Clymer's claims are not barred by res judicata, and having concluded that Long and Big Hill are not entitled to summary judgment on any alternative grounds, we hold that it was error for the court to grant summary judgment against Arthur and Clymer.

C. Stoneridge's Alternative Grounds

{¶ 217} Against Stoneridge, Arthur and Clymer asserted in their complaint that Stoneridge contracted with Carpenter to allow her to retain the cell-tower rental income but Stoneridge failed to except that right to receive the income from the purchase agreement or from the warranty deed given to Arthur and Clymer.

{¶ 218} In their motion for summary judgment, Stoneridge asserted that it had no right to sell or transfer the cell-tower rental income, which belonged to Carpenter. According to Stoneridge,

allegations that Stoneridge promised the cell-tower income to Arthur and Clymer, or misrepresented terms relating to the income, or fraudulently induced Arthur and Clymer to agree to the contract are absent from their complaint. Stoneridge asserted that it "complied with all terms negotiated in the Contract and did not breach its agreement" with Arthur and Clymer, and that because Arthur and Clymer agreed to the terms of the contract, and were silent after its execution, they are "equitably estopped from now taking a contrary position to the prejudice of Stoneridge." Stoneridge also asserted that it is entitled to judgment as a matter of law because Arthur and Clymer had actual notice of the cell-tower lease, such that the omission of the cell-tower lease from the deed is irrelevant. Stoneridge relied in part upon *Schloss v. Brown,* 13 Ohio App. 294. Stoneridge asserted that Arthur and Clymer suffered no damages. Finally, Stoneridge asserted that Carpenter owned the rights to the rental income, and Stoneridge "cannot contract for, give away, or 'except' anything it does not own."

{¶ 219} In their memorandum opposing Stoneridge's motion for summary judgment, Arthur and Clymer asserted that the contract expressly provided for the proration of rentals, and they asserted that they, and not Stoneridge, were entitled to the protection of equitable estoppel.

### 1. Breach of Contract

{¶ 220} "Generally, a plaintiff must present evidence on several elements to successfully prosecute a breach of contract claim. Those elements include the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600, 649 N.E.2d 42.

{¶ 221} " 'When the language of a written agreement is clear, a court may look no further than the writing itself to find the intent of the parties.' " *Outback/Buckeye-II Ltd. Partnership v. Lofino Grandchildren's Trust*, Greene App. Nos. 06-CA-2 and 06-CA-44, 2007-Ohio-577, ¶ 53.

{¶ 222} Stoneridge's position is that it did not transfer the rental income to Arthur and Clymer by means of the contract. The contract to purchase expressly provides for the proration of rental income, and it does not expressly exclude the cell tower rental income. Construing the evidence most strongly in favor of Arthur and Clymer, we cannot conclude as a matter of law that Stoneridge is not in breach of its contract with Arthur and Clymer such that Arthur and Clymer suffered no damage.

## 2. Breach of Warranty

{¶ 223} According to Stoneridge, Arthur and Clymer's breach of warranty claim is barred by Arthur and Clymer's actual knowledge that Carpenter retained the rights to the rental income, in reliance upon *Schloss v. Brown,* 13 Ohio App.294, and Stoneridge further asserts that constructive notice can bind a purchaser to an unrecorded encumbrance, in reliance upon *Four Howards, Ltd. v. J & F Wenz Road Invest., L.L.C.*, 179 Ohio App.3d 399, 2008-Ohio-6174.

{¶ 224} The survivorship deed attached to Arthur and Clymer's complaint covenants the property at issue "subject to taxes and assessments which are now or may hereafter become liens on said premises and except conditions and restrictions and easements, if any, contained in former deeds of record for said premises, subject to all of which this conveyance is made."

{¶ 225} As determined in Carpenter's appeal, the contract to purchase did not except the rental income but rather expressly provided for the proration of rental income. When Long did not provide the release at closing, according to Arthur's affidavit, Arthur "believed that Stoneridge had realized that it was obligated to honor the terms of the purchase agreement and because the deed did not exclude the cell tower land rentals or otherwise reserve those to [Carpenter], I accepted the deed from Stoneridge." Arthur and Clymer were told by the title agent that there were no interests of record encumbering the property. Arthur and Clymer were unaware of the existence of the unrecorded

assignment instruments. Stoneridge had no contact with Arthur and Clymer in the course of the transaction. Accordingly, we cannot conclude that Arthur and Clymer had actual knowledge of Carpenter's purported interest in the rental income, and Stoneridge is not entitled to summary judgment on this basis.

### 3. Estoppel

{¶ 226} According to Stoneridge, by signing the contract, Arthur and Clymer represented that they approved of and accepted its terms, despite the lack of terms related specifically to cell-tower income; they misled Stoneridge by rushing to complete the sale with the intent to later initiate litigation to attempt to wrongly gain the rental income; and Stoneridge relied upon Arthur and Clymer's acceptance of the contract terms by completing the transaction and transferring the property to Arthur and Clymer to their detriment.

{¶ 227} "Equitable estoppel precludes a party from asserting certain facts where the party, by his conduct, has induced another to change his position in good-faith reliance upon that conduct. * * * The purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice. * * *

{¶ 228} " 'A prima facie case for equitable estoppel requires a plaintiff to prove four elements: (1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) [that it induced] actual reliance which is reasonable and in good faith; and (4) [that the reliance caused] detriment to the relying party.' " *Hutchinson v. Wenzke* (1999), 131 Ohio App.3d 613, 178, 723 N.E.2d 176, quoting *Doe v. Blue Cross/Blue Shield of Ohio* (1992), 79 Ohio App.3d 369, 379, 607 N.E.2d 492.

{¶ 229} To establish that Arthur and Clymer "misled all defendants," Stoneridge directed the trial court's attention to the following testimony by Arthur:

{¶ 230} "Q. * * * Have you ever had any communications with Bob Abernathy about this property?

{¶ 231} "A.  No.

{¶ 232} "Q.  Do you know if Chanin has?

{¶ 233} "A.  Yes, I know she has not.  He stated that he did to Cindy Jurcenco.

{¶ 234} "* * *

{¶ 235} "Q.  Have you ever had any conversations with anybody associated with Stoneridge Development?

{¶ 236} "A.  Correct.

{¶ 237} "Q.  The answer is that you have not had any communications?

{¶ 238} "A.  That I recall.

{¶ 239} " * * *

{¶ 240} "Q.  All right.  You mentioned that you had some conversations with a woman with Cincinnati Bell.  Do you recall that testimony?

{¶ 241} "A.  Yes.

{¶ 242} "Q.  When did that conversation take place?

{¶ 243} "A.  I can only - - it's vague recollections of the days following the purchase contract and trying to find out something about cell tower leases.

{¶ 244} "Q.  So this conversation with - - what was the name of this woman?

{¶ 245} "A.  Cindy Jurcenco.

{¶ 246} "Q.  So this conversation with Cindy Jurcenco would have been prior to the closing of the property?

**{¶ 247}** "A.  Yes, it was.

**{¶ 248}** "Q.  And at that time, you knew that those cell phone towers were owned by Cincinnati Bell, correct?

**{¶ 249}** "A.  Yes.

**{¶ 250}** "Q.  So you had no understanding or belief that Anna Carpenter actually owned those towers?

**{¶ 251}** "A.  Oh, correct.  I didn't know that.  I knew she owned the property that it was on.

**{¶ 252}** "* * *

**{¶ 253}** "Q.  Well, when you called and talked to the representative from Cincinnati Bell, it was your understanding at that time that Cincinnati Bell owned those towers - -

**{¶ 254}** "A.  Yes.

**{¶ 255}** "Q.   - - and that Anna Carpenter was getting the rental payments?

**{¶ 256}** "A.  Yes, yes.

**{¶ 257}** "Q.  So you were aware at that time that Anna Carpenter was getting the rental payments from Cincinnati Bell?

**{¶ 258}** "A.  Yes.

**{¶ 259}** "Q.  And once you found that out and you had concerns about whether you were entitled to those rental payments instead, did you ever ask to postpone the closing on the property?

**{¶ 260}** "A.  No, I didn't.

**{¶ 261}** "Q.  And that was a decision that you made?

**{¶ 262}** "A.  Yes."

**{¶ 263}** Even if we were to conclude that Stoneridge, who had no contact with Arthur and

Clymer at any time, established that Arthur and Clymer had made a factual misrepresentation that was misleading when it accepted Stoneridge's counteroffer, Stoneridge is not entitled to the protection of equitable estoppel because it cannot establish that it reasonably relied, in good faith, on Arthur and Clymer's alleged representation that the rental income was not a material part of the transaction. The following exchange occurred in the deposition of Robert Abernathy, agent for Stoneridge:

**{¶ 264}** "Q. * * * Now, in your transaction with Anna Carpenter, you have committed with her that she could retain cell tower rentals upon your purchase from her of her land including this five acres; is that correct?

**{¶ 265}** "A.  Yes, sir.

**{¶ 266}** "Q.  And do I take it it was your intention that the sale agreement with Mr. Arthur and Mrs. Clymer would exempt out, except from the transaction, those rentals?

**{¶ 267}** "A.  Yes, sir.

**{¶ 268}** "Q.  Could you explain why * * * the contract to purchase fails to make that exemption, that exception for the cell tower rentals?

**{¶ 269}** "A.  No, sir."

**{¶ 270}** Abernathy then testified that Long assured him that he had informed Arthur and Clymer that Carpenter retained the right to the income.  The following exchange occurred:

**{¶ 271}** "Q.  Did [Long] provide you any documentation, any writings that verified - - documented that fact?

**{¶ 272}** "A.  No, sir.

**{¶ 273}** " * * *

**{¶ 274}** "Q.  If that was a concern prior to and at the time of signing the contract to purchase,

54

why is it then that you didn't look specifically to see in the contract with Arthur and Clymer that the rentals had been carved out?

**{¶ 275}** "* * *

**{¶ 276}** "A. In hindsight that probably should have been done, but I find it impossible to believe that somebody can't see a cell tower and know they didn't sign anything or have anything and they were notified that they weren't going to get the cell tower income, that anybody would even try to do something so despicable."

**{¶ 277}** The contract to purchase provides for the proration of rental income, and Abernathy, in his employment with Stoneridge, undoubtedly has extensive experience with real estate contracts and the provisions they contain. Abernathy intended that the purchase contract exclude the rental income from the transaction. He included in the contract an addendum that conditioned the Arthur and Clymer closing on the closing of the Carpenter and Stoneridge transaction, but he did not except the rental income. Abernathy executed the assignment-of-rent payments with Carpenter but did not provide the document to Arthur and Clymer prior to or at closing, and the document was not recorded. Abernathy had no documentation that Long adequately protected Carpenter's interest, such as a release of their rights to the income. Abernathy admits that he should have verified that the rentals were excepted from the contract. Accordingly, Stoneridge cannot establish that it reasonably and in good faith proceeded to closing in reliance upon any alleged representation by Arthur and Clymer that, by accepting the contract terms, they were not entitled to the rental income. Even if we believed that Arthur and Clymer knew that they were not entitled to the rental income, the existence of the rental provision in the contract renders Stoneridge's reliance upon the alleged misrepresentation unreasonable.

{¶ 278} Having determined that Arthur and Clymer's claims against Stoneridge are not barred by the doctrine of res judicata, and having found that Stoneridge is not entitled to summary judgment on the alternative bases asserted by it, we hold that it was error for the trial court to grant summary judgment in favor of Stoneridge. In so holding, we note that the trial court's decision granting summary judgment in favor of Long and Big Hill on Stoneridge's cross-claim for indemnity against Long and Big Hill is also error.

{¶ 279} Having found error in the trial court's grant of summary judgment to all defendants, the trial court's judgment is reversed, and the cause is remanded for further proceedings.

Judgment reversed

and cause remanded.

. . . . . . . . . .

HALL, J., concurs.

FAIN, J., concurs separately.

FAIN, J., concurring:

{¶ 280} I concur fully in both the judgment and in Judge Donovan's opinion for this court. I write separately merely to clarify my reason for concluding that collateral estoppel does not apply to bar the claims of the plaintiffs in these causes of action.

{¶ 283} The application of collateral estoppel requires that the issue litigated in a prior cause of action be the same as the issue litigated in the later cause of action. In this case, those issues are not the same.

{¶ 284} Arthur and Clymer thought that they were obtaining the rental income from the Cincinnati Bell Wireless tower as part of the transaction negotiated between them and Carpenter.

Conversely, Carpenter thought that she was retaining that rental income. In each case, the issue of whether Carpenter, or Arthur and Clymer, would emerge from the transaction with the rental income is different from the issue of whether Carpenter, or Arthur and Clymer, failed to emerge from the transaction with the rental income as a result of the negligence of some or all of the defendants. In other words, the essence of the cause of action of each plaintiff against each defendant is: "I did not come away from the transaction with the rental income, and the reason I didn't is due to your negligence."

{¶ 285} The issue in each plaintiff's cause of action is not the same as the issue between the two plaintiffs: which plaintiff – Carpenter or Arthur and Clymer – is entitled to the rental income. In fact, as to each plaintiff, that plaintiff's failure to have obtained all the rental income in the transaction between them, far from precluding their cause of action against their respective defendants, is an essential element of that cause of action. Carpenter, for example, would have no cause of action against the defendants in her lawsuit if she had, in fact, retained the rights to the rental income in her transaction with Arthur and Clymer. Conversely, Arthur and Clymer would have no cause of action against the defendants in their lawsuit if they had, in fact, obtained the rights to the rental income in their transaction with Carpenter.

{¶ 286} The issue in each plaintiff's cause of action is different from the issue that was settled between the two plaintiffs. Therefore, collateral estoppel does not bar their claims against their respective defendants.

. . . . . . . . . .